1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

DONALD TAYLOR,

           Plaintiff,

   v.

JAMES SCALLY, *et al.*,

           Defendants.

Case No. 2:23-cv-00916-RFB-MDC

**ORDER**

Before the Court for consideration is the is the (ECF No. 18) Motion for Summary Judgment by Defendants Katie Aguilar and James Scally and (ECF No. 25) Motion for Summary Judgment by Plaintiff Donald Taylor. For the following reasons, the Court denies both Motions.

## I.    PROCEDURAL HISTORY

This action brought by Plaintiff Donald Taylor, *pro se*, asserts claims pursuant to 42 U.S.C. § 1983 based on alleged events which occurred while he was incarcerated at Southern Desert Correctional Center ("SDCC"). On June 8, 2023, Plaintiff filed an application to proceed *in forma pauperis* ("IFP") and attached his Complaint. ECF No. 1. On January 4, 2024, the Court screened Plaintiff's Complaint and allowed his claim for First Amendment retaliation to proceed. ECF No. 3. The Clerk of Court filed the Complaint. ECF No. 4. The case was stayed pending a mediation conference, and after no settlement was reached, the Court granted Plaintiff's IFP application and lifted the stay. ECF No. 11.

On April 10, 2024, the Office of the Attorney General accepted service on behalf of Defendants Katie Aguilar and James Scally. ECF No. 13. On May 20, 2024, Defendants filed their Answer. ECF No. 14. On May 21, 2024, the Court entered a Scheduling Order, with a discovery

deadline of November 18, 2024, and dispositive motions due December 18, 2024. ECF No. 15. On December 18, 2024, Defendants filed the instant Motion for Summary Judgment. ECF Nos. 18, 19. On February 21, 2024, Plaintiff filed his Opposition and Motion for Summary Judgment "in opposition." ECF Nos. 24, 25. On March 14, 2024, Defendants filed their Reply and Opposition to Plaintiff's Motion for Summary Judgment. ECF Nos. 28, 29. On June 18, 2025, the Court held a hearing on the pending Motions and took them under advisement. ECF No. 31. The Court's Order on the pending Motions follows.

## II.    FACTUAL BACKGROUND.

The Court makes the following findings of undisputed and disputed facts.

### i.  *Undisputed Facts*

On September 20, 2021, around 1 p.m., individuals incarcerated in Unit 12A at SDCC engaged in a peaceful protest regarding the facility's gym and outdoor yard time schedule. At that time, Plaintiff was housed in Unit 12A. The protest involved filing emergency grievances regarding the lack of gym and yard time. Defendant James Scally, Associate Warden for SDCC, sent Defendant Katie Aguilar, Correctional Sergeant, to the Unit to deescalate what Defendant Scally deemed "a potential situation." Defendant Aguilar went to the unit and threatened Plaintiff and other participants with the loss of their yard and gym privileges if they continued filing emergency grievances.

Plaintiff participated in the protest and attempted to file a handwritten emergency grievance by submitting it to Aguilar. The grievance stated "Southern Desert Correctional Center is causing an uproar by using the gym, yard, canteen as a way to start confusion also programs that's needed for parole by taking it away. Also taking our yard that's federally and state mandated one hour a day." (cleaned up). It was dated September 20, 2021, at 1:45 p.m., and signed by Plaintiff. Defendant Aguilar refused to process his grievance.

Aguilar reported back to Scally, and because "a mass of offenders within Unit 12A refused to cease improper activity with grievances," a tactical response team was created by Warden Hutchings and Scally to enter Unit 12A and remove the leader of the protest. The response team

1   included Lieutenant Carlman, Sergeant Aguilar as "second lead," two officers who filmed the
2   incident, officer(s) armed with pepper ball guns, officer(s) armed with 40-millimeter guns with
3   less lethal rounds, and officers with shields. The team entered the Unit, where protesters were
4   standing or sitting on the floor or in chairs in the center. Lieutenant Carlman issued a verbal
5   command to those present to return to their bunks if they did not want to be involved, with a
6   warning that force would be used in response to any furtive or aggressive action. Plaintiff returned
7   to his bunk. After two additional warnings, some officers surrounded the protest leader, arrested,
8   and extracted him, while another officer fired several 40 mm less lethal rounds at prisoners.

9   After the officers removed the protest leader, Scally announced the unit would be on
10  lockdown for a week, with no visitation, canteen, or yard privileges, and that the Warden would
11  lift the lockdown if there were no problems after one week. After some of the prisoners began
12  shouting in response, a roll of toilet paper was thrown at Aguilar, and an officer shot another less
13  lethal round in the direction that the object came from. The team then left the unit, and one officer
14  shouted "WOO!" while another shouted "I shot two people!" and Sergeant Aguilar remarked
15  "fucker threw shit at me!"

16  Following the September 20, 2021 incident, Unit 12A was locked down for two weeks.
17  Associate Warden Scally did not have the authority to institute the lockdown without the approval
18  of the Warden, however, he and other prison officials had the ability to provide input
19  recommending the lockdown to the Warden.

20                          1.  NDOC's Grievance Procedure and Plaintiff's Grievance History

21  The Nevada Department of Corrections ("NDOC") has an "Inmate Grievance Procedure"
22  set forth in Administrative Regulation 740 ("AR 740"), which requires an incarcerated person to
23  file an informal grievance ("Informal Grievance"), a first level appeal ("First Level grievance"),
24  and a second level appeal ("Second Level grievance") to fully exhaust their administrative
25  remedies. ECF No. 18-9.[1]

26  The regulation provides a procedure for emergency grievances concerning a life-
27
28  _____

    [1] Defendants did not produce an authenticated copy of AR 740; however, Plaintiff does not
    dispute the document's authenticity.

1  threatening issue or a safety and security risk for the institution. AR 740.07(1). Emergency

2  grievances are to be handed to any staff member for immediate processing and documented in

3  NOTIS[2] within 24-hours of receipt. AR 740.01(2)(B). The filing of two or more emergency

4  grievances in a seven-day period which are deemed not to be emergencies may result in

5  disciplinary action against the inmate for abuse of the grievance system. AR 740.04(2)(C).

6      All grievances, whether accepted or not, "will be entered into NOTIS." AR 740.01(1). A

7  Grievance Coordinator is required to record receipts, transmittals, actions, and responses on all

8  grievances to NOTIS within three working days of receipt. AR 740.01(6). Grievance documents

9  are required to be stored at the facility where the issue occurred for a minimum of five years

10  following final disposition of the grievance, while the results of the grievance are stored in NOTIS.

11  AR 740.02(1). The time limit for a response to an Informal and First Level grievance is forty-five

12  (45) days, and to a Second Level grievance is sixty (60) days. AR 740.08(12); 740.09(5);

13  740.10(3).

14      The following grievance history is taken from the NDOC "Inmate Grievance Report"

15  produced by Defendants. ECF No. 18-6. The Court notes that the document is not authenticated,

16  does not include copies of the original grievance forms written by Plaintiff, which AR 740

17  indicates should have been stored in Plaintiff's grievance file, includes only cut off excerpts of the

18  text of the grievances written by Plaintiff in the "inmate complaint" sections of the report, and

19  contains various conflicting dates. See e.g., ECF No. 18-6 at 3 (indicating a "transaction date of

20  8/30/22," while the typed text under "Inmate Complaint" includes a date of 3/22/23 and 5/1/23).

21  The Court further notes that the Grievance Report does not include any record of the September

22  20, 2021 emergency grievance Plaintiff attempted to submit to Aguilar.

23      On September 22, 2021, Plaintiff filed an Informal Grievance to Defendant Scally

24  regarding the September 20, 2021 incident, complaining of Aguilar's threats of retaliation and

25  intimidation regarding the use of grievances, Aguilar's incitement of hostility in Unit 12A,

26  including having officers fire shots at him and others despite them listening to their commands,

27  and complaining of Post-Traumatic Stress Disorder caused by the shooting. On December 14,

28

_____

[2] "NOTIS" is not defined within the document AR 740 produced by Defendants.

2021, Plaintiff's Informal Grievance was denied on the basis that Aguilar was acting within the scope of her duties in informing the inmate population that their grievances were not an emergency. On December 21, 2021, Plaintiff signed the rejection and stated that he disagreed.

On December 22, 2021, Plaintiff filed a first level appeal of the denial of his informal grievance. It appears the appeal was not processed until February 2, 2022, and was not substantively rejected until March 10, 2023. The March 2023 rejection stated the informal level rejection was proper because Aguilar did not retaliate, but rather was responding to the mass of emergency grievances being submitted, and the loss of recreation was not something that could be complained about in an emergency grievance.

On May 28, 2022, Plaintiff attempted to appeal his First Level grievance to the Second Level due to having received no response. The Second Level grievance appears to have been rejected on or around June 20, 2022, for failure to attach prior submitted grievances and "the prior DOC 3098 Improper Grievance Memo(s)" under the grievance number. There is also a conflicting date of March 22, 2023 within the entry. The rejection cites AR 740.08(5) as the basis for the rejection, which requires "all documentation and factual allegations available to the inmate" to be submitted with a grievance, however AR 740.08 refers to "Informal Grievance," not First or Second Level grievances. AR 740.09 refers to "First Level Grievance," and AR 740.10 refers to "Second Level Grievance," and neither section contains a requirement to attach documentation like the one in AR 740.08.

In or around August of 2022, Plaintiff made three additional attempts to file a Second Level grievance, each of which were rejected for failure to attach documentation pursuant to AR 740.08(5)—the regulation regarding Informal Grievances. In his third attempt to file a Second Level grievance he noted he had not received a response to his First Level grievance for over eight months. His third attempt to file a Second Level grievance was rejected and he was forbidden from resubmitting any additional Second Level grievances due to the three previous rejections.

///

### ii. *Disputed Facts*

The parties dispute whether the two-week lockdown was instituted for safety and security,

1    or as retaliation for the prisoners in Unit 12A using the emergency grievance system. Defendants

2    contend Plaintiff was not a participant in the protest, based on the fact that his grievance history

3    report does not reflect any grievance filings before September 22, 2021 relating to the gym and

4    yard schedules, and according to Defendants Plaintiff does not appear in the video recordings of

5    the September 20, 2021 incident. Defendants also contend based on the video recordings that

6    Plaintiff was not shot at. The Court finds the video footage is unclear such that who was shot at

7    cannot be determined.  Plaintiff attests that he was a participant in the protest, he attempted to file

8    a grievance but was prevented from doing so by Defendant Aguilar, and that he was shot at while

9    in his bunk area, despite obeying officer commands.

10

11    **III.    LEGAL STANDARD**

12            Summary judgment is appropriate when the pleadings, depositions, answers to

13    interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no

14    genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

15    Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering

16    the propriety of summary judgment, the court views all facts and draws all inferences in the light

17    most favorable to the nonmoving party. Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960

18    (9th Cir. 2011). If the movant has carried its burden, the non-moving party "must do more than

19    simply show that there is some metaphysical doubt as to the material facts . . . Where the record

20    taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

21    genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal

22    quotation marks omitted). Where a genuine dispute of material fact exists, however, the court will

23    assume the version asserted by the non-moving party. See Bryan v. MacPherson, 630 F.3d 805,

24    823 (9th Cir. 2010); Coles v. Eagle, 704 F.3d 624, 629 (9th Cir. 2012) ("We must, in the context

25    of summary judgment, resolve this disputed factual issue in favor of [the non-moving party and]

26    draw all reasonable inferences in his favor . . . ").

27            ///

28            ///

1    **IV.    DISCUSSION**

2         As an initial matter, the Court notes that although Plaintiff's (ECF No. 25) filing is styled

3    as a "Motion for Summary Judgment," it appears to be an Opposition to Defendant's Motion for

4    Summary Judgment. The Court construes the filing as such and therefore denies Plaintiff's Motion

5    for Summary Judgment.

6         The Court now turns to the merits of Defendant's Motion.

7    **A. Administrative Exhaustion**

8         Defendants argue they should be granted summary judgment because Plaintiff failed to

9    exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"), pursuant

10   to NDOC's AR 740. For the following reasons, the Court finds Defendants failure to exhaust

11   defense fails.

12        Congress enacted the PLRA to "reduce the quantity and improve the quality of prisoner

13   suits." Perttu v. Richards, 145 S. Ct. 1793 (2025) (citing Porter v. Nussle, 534 U.S. 516, 524

14   (2002). A "centerpiece" of the PLRA is its exhaustion provision which requires an incarcerated

15   person to "complete the administrative review process in accordance with the applicable

16   procedural rules" before bringing a 42 U.S.C. § 1983 suit in federal court relating to prison

17   conditions. Id. at 1798 (quoting Woodford v. Ngo, 548 U.S. 81, 84 (2006); 42 U.S.C. § 1997e(a)).

18   Failure to exhaust under the PLRA is an affirmative defense and defendants bear the burden of

19   proving it. Jones v. Bock, 549 U.S. 199, 216 (2007). If the defendants do so, then the burden shifts

20   to the inmate to show "there is something in his particular case that made the existing and generally

21   available administrative remedies effectively unavailable to him by showing that the local

22   remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile."

23   Williams v. Paramo, 775 F.3d 1182, 1191 (9th Cir. 2015) (quotation omitted).

24        The Court finds from the record that the administrative grievance process under AR 740

25   was effectively unavailable to Plaintiff, such that any failure to exhaust is excused. When

26   circumstances render administrative remedies "effectively unavailable," an inmate's failure to

27   exhaust is excused. Sapp v. Kimbrell, 623 F.3d 813, 824 (9th Cir. 2010) (excusing failure to

28   exhaust where the prison's improper screening of grievances thwarted the plaintiff's attempt to

exhaust); see also Nunez v. Duncan, 591 F.3d 1024, 1027-28 (9th Cir. 2009) (exhaustion excused where the plaintiff was misled into thinking he needed a particular, unobtainable document to pursue his grievance).

The NDOC Defendants argue Plaintiff's claim is barred by his failure to exhaust, because he failed to properly file a Second Level grievance. It is undisputed that Plaintiff filed an Informal Grievance and a First Level grievance, and that the latter was rejected on the merits over two years later. Plaintiff also made four attempts to file a Second Level grievance, each of which was rejected for failure to attach documents pursuant to a documentation requirement that, according to the rules set forth in AR 740 as reflected in the documented provided to the Court by Defendants, applied to Informal Grievances, not Second Level grievances.

The Court finds AR 740 was rendered effectively unavailable to Plaintiff for several reasons. First, because Plaintiff did not receive a rejection of his First Level grievance until over two years after he filed it, and a response was due within 45 days, the Second Level grievance process was effectively unavailable. See id. (the failure of officials to process a first-level grievance for six months rendered the grievance process effectively unavailable) (citing Andres v. Marshall, 867 F.3d 1076, 1078 (9th Cir. 2017). Further, Plaintiff made *four attempts* at filing a Second Level grievance, and each attempt was rejected pursuant to an inapplicable documentation requirement—with no finding by the processing officials that the required documentation was *actually available* to Plaintiff. Id. ("[W]here inmates take reasonably appropriate steps to exhaust but are precluded from doing so by a prison's erroneous failure to process the grievance, [the Court has] deemed the exhaustion requirement satisfied."). The effective unavailability of the Second Level appeal process is further evident in officials prohibiting Plaintiff from making any further attempts to comply with the AR 740 Second Level grievance procedure after they erroneously rejected it three times.

Finally, the Court finds the record demonstrates NDOC's grievance processing, tracking, and recordkeeping system is unreliable. NDOC's grievance history report does not contain the September 20, 2021 emergency grievance, which Defendant Aguilar refused to process and document in contravention of AR 740's requirements. Further, the Report is unauthenticated and

replete with indicia of unreliability, including conflicting date entries and cut off text of Plaintiff's complaints. Moreover, Defendants have failed to produce original copies of the grievance forms submitted by Plaintiff, even though AR 740 requires the facility to retain copies of the original grievance forms in a separate file for at least five years after the grievance is resolved. Accordingly, Defendants have failed to meet their burden of proving Plaintiff's failure to exhaust, because the records of Plaintiff's grievance history they provided is both unreliable and incomplete. See Kimbro v. Miranda, 735 F. App'x 275, 278 (9th Cir. 2018) ("Where prison officials fail to retain records relating to the filing or processing of an inmate's grievance, the prisoner should be deemed to have exhausted administrative remedies.").

### B.  First Amendment Retaliation

Defendants argue Plaintiff's First Amendment Retaliation claim fails against Defendants Aguilar and Scally because (1) he did not file an emergency grievance as a participant in the protest; (2) even if he did, he misused the emergency grievance system such that his conduct should not be considered protected; and (3) the Court should grant Defendants latitude with regards to the decision to lockdown Plaintiff's Unit because it was done to further legitimate penological objectives of safety and security. For the following reasons, the Court finds there are genuine disputes of fact material to Plaintiff's First Amendment retaliation claim, precluding summary judgment.

There are five basic elements for a claim of First Amendment retaliation in the prison context: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009) (quoting Rhodes v. Robinson, 408 F.3d 559, 567 (9th Cir. 2005)).

Defendants' assertion that Plaintiff did not engage in protected activity because he did not in fact file the September 20, 2021 emergency grievance based on NDOC's grievance tracking system is disputed. It is thus for a jury to decide whether the grievance Plaintiff produced was submitted by him to Defendant Aguilar, and Aguilar refused to process it despite the requirements

1    that she do so pursuant to AR 740.

2        Likewise, Defendants contention that Plaintiff's attempt to file an emergency grievance

3    complaining of the deprivation of his constitutionally protected right to gym and yard time was a

4    misuse of the emergency grievance process, such that his conduct should be deemed

5    "unprotected," is unsupported by any binding or persuasive precedent. Defendants only citation is

6    to a Sixth Circuit case, Thaddeus-X v. Blatter, 175 F.3d 378 (6th Cir. 1999), in which the court

7    stated, "if a prisoner violates a legitimate prison regulation, he is not engaged in 'protected

8    conduct.'" 175 F.3d. at 395. But that principle is merely a restatement of the fifth element of a

9    First Amendment retaliation claim in the Ninth Circuit, which requires a plaintiff to prove that any

10   allegedly retaliatory adverse action "did not reasonably advance a legitimate correctional goal."

11   See Brodheim, 584 F.3d at 1269. And the Court finds Defendants' assertion that the lockdown was

12   in furtherance of a legitimate correctional goal because it was necessary for "safety" and "security"

13   to be an issue of fact of the jury. Said assertion, attested to by Defendant Scally, is vague and

14   conclusory, and a reasonable juror could find from the record, including the footage of September

15   20, 2021 incident, that the lockdown was retaliatory and designed to chill Plaintiff and others in

16   Unit 12A from engaging in the protected activity of utilizing the emergency grievance process,

17   even where their use of the process did not pose a threat to safety and security.

18        **C.  Qualified Immunity**

19        Defendants argue they are entitled to summary judgment based on qualified immunity.

20   Qualified immunity protects government officials from liability under § 1983 unless (1) they

21   violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was

22   clearly established at the time." Cuevas v. City of Tulare, 107 F.4th 894, 898 (9th Cir. 2024).

23   Further, to establish a defendant's violation of a constitutional right, a plaintiff must show

24   "personal participation by the defendant." Taylor v. List, 880 F.2d, 1040, 1045 (9th Cir. 1989).

25        ***i.  Clearly Established***

26        "The 'clearly established' inquiry is a question of law that only a judge can decide."

27   Morales v. Fry, 873 F.3d 817, 821 (9th Cir. 2017). "The question is whether the officers' actions

28   are 'objectively reasonable' in light of the facts and circumstances confronting them, without

1    regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989); see

2    also Ziglar v. Abbasi, 582 U.S. 120, 151 (2017) ("Whether qualified immunity can be invoked

3    turns on the 'objective legal reasonableness' of the official's acts."). "In the Ninth Circuit, we

4    begin [the clearly established] inquiry by looking to binding precedent. If the right is clearly

5    established by decisional authority of the Supreme Court or this Circuit, our inquiry should come

6    to an end." Moore v. Garnand, 83 F.4th 743, 750 (9th Cir. 2023).

7         The right of prisoners to file grievances under the First Amendment was well settled at the

8    time of Defendants' acts in this case. "Retaliation against prisoners for their exercise of this right

9    is itself a constitutional violation and prohibited as a matter of 'clearly established law.'"

10   Brodheim, 584 F.3d at 1269; see also Shepard v. Quillen, 840 F.3d 686, 688 (9th Cir. 2016).

11   "Without those bedrock constitutional guarantees, inmates would be left with no viable mechanism

12   to remedy prison injustices. And because purely retaliatory actions taken against a prisoner for

13   having exercised those rights necessarily undermine those protections, such actions violate the

14   Constitution quite apart from any underlying misconduct they are designed to shield." Rhodes v.

15   Robinson, 408 F.3d 559, 567 (9th Cir. 2005)

16        The Court finds the use of threats, force, and a lockdown depriving prisoners of their

17   access to visitation, outdoor exercise, and other recreation in response to their use of the emergency

18   grievance process was not "objectively reasonable" because the right of prisoners to utilize the

19   grievance process was clearly established. Additionally, AR 740.04(2) specifically provides the

20   procedure for disciplining alleged abuse of the emergency grievance process, and requires review

21   by a Grievance Coordinator, an individualized recommendation to the Warden, a Notice of

22   Charges, and processing through the inmate disciplinary process. The record does not indicate that

23   Defendants followed those procedures with regards to Plaintiff. Accordingly, if a jury finds

24   Defendants' conduct was based on retaliatory motives rather than the asserted legitimate

25   penological interest of safety and security, the unlawfulness of Defendants' conduct was clearly

26   established such that Defendants are not entitled to qualified immunity.

27        The Court next turns to each Defendants' personal participation in the alleged retaliation.

28        ///

### ii. *Defendant Aguilar*

Defendants argue that Aguilar is entitled to qualified immunity because she merely informed Plaintiff and others about the emergency grievance rules under AR 740, her participation in the extraction of the protest leader did not affect Plaintiff, and only the Warden had the authority to institute the allegedly retaliatory lockdown. First, the Court finds that whether Aguilar merely informed the prisoners of the potential consequences of abusing the emergency grievance procedure under AR 740 or unlawfully threatened them in a retaliatory manner is a material dispute of fact. Plaintiff and other witnesses contend she was hostile and utilized intimidation, while Defendants insist she engaged the prisoners to "gather information" and "deescalate a potential situation with the offenders."

Additionally, the Court finds a jury could reasonably conclude from Plaintiff's and other the testimony of other incarcerated persons in Unit 12A, as set forth in declarations provided by Plaintiff, combined with the video footage of the September 20, 2021 incident, that Aguilar personally participated in directing the response team to engage in the use of force—which Plaintiff contends resulted in him being shot at—and influencing the Warden's decision to lockdown Plaintiff's Unit. According to Aguilar's own report detail regarding the incident, Aguilar reported to Defendant Scally regarding her interactions with the prisoners in Unit 12A and specifically requested the extraction of the protest leader, which led to the decision to assemble the response team. Further, Aguilar has not produced any declaration or other evidence disputing that she had influence over the lockdown decision, and it was Aguilar who informed Plaintiff and others of the potential lockdown and then announced the lockdown, as shown in the video footage. Scally's declaration specifically attests that prison officials can provide input to the Warden recommending a lockdown, although the Warden had final decision-making authority. A reasonable juror could thus conclude that Aguilar personally participated in retaliation in violation of Plaintiff's First Amendment rights by directing the response team's use of force and influencing the Warden's decision to institute the lockdown of Plaintiff's Unit. Qualified immunity is therefore denied as to Aguilar. While the parties do not dispute Aguilar's personal participation, the Court finds that there are genuine issue of disputed of fact of whether Aguilar directed alleged retaliatory

1    action or participated in such action. Qualified immunity is therefore denied as to Aguilar.

2        **iii.  *Defendant Scally***

3        To establish a supervisor's liability for retaliation under the First Amendment, a plaintiff

4    must "demonstrate an immediate supervisor knew about the subordinate violating another's federal

5    constitutional right to free speech, and acquiescence in that violation." <u>OSU Student All. v. Ray</u>,

6    699 F.3d 1053, 1075 (9th Cir. 2012). Here, Scally specifically attests to having directed Aguilar

7    to engage the prisoners in Unit 12A regarding their use of the emergency grievance procedures

8    and having made the decision to assemble the response team. He further attests the lockdown was

9    instituted for safety and security reasons and does not dispute that he influenced the Warden's

10   decision to enact the lockdown. Accordingly, if a jury finds those actions were unlawful retaliation

11   under the First Amendment, the jury could also reasonably conclude Scally personally participated

12   in the alleged retaliatory action.

13

14   **V.    CONCLUSION**

15       For the foregoing reasons, **IT IS ORDERED** that Defendants' (ECF No. 18) Motion for

16   Summary Judgment is **DENIED**.

17       **IT IS FURTHER ORDERED** that Plaintiff's (ECF No. 25) Motion for Summary

18   Judgment is **DENIED**.

19       **IT IS FURTHER ORDERED** that the parties shall file a joint proposed pretrial order on

20   or before **November 14, 2025**.

21

22       **DATED:** September 29, 2025.

23

24                                    _____

25                                    **RICHARD F. BOULWARE, II**
                                     **UNITED STATES DISTRICT JUDGE**

26

27

28

- 13 -